**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 21-MJ-297** |
| | **:** | |
| **THOMAS F. SIBICK,** | **:** | |
| | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S MEMORANDUM
### IN SUPPORT OF DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion in the Western District of New York that the defendant, Thomas F. Sibick, be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (Crime of Violence). Based on the following argument, there are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community pursuant to 18 U.S.C. § 3142(e).

The government respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

### FACTUAL BACKGROUND[1]

**I.   The Attack on the United States Capitol on January 6, 2021.**

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session,

---

[1] The government also included a statement of facts in its Motion for Emergency Appeal of Release Order, ECF No. 7. That statement of facts was based largely on the allegations made in the affidavit accompanying the Complaint. *See*

elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence ("Vice President Pence") was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol ("the Capitol"). Temporary and permanent barricades were in place around the exterior of the Capitol building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the Capitol building. The certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of the USCP, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the

---

ECF No. 1-1. This motion refers primarily to the affidavit accompanying the Complaint, but includes additional context as well as new information that the United States has learned since the filing of the Complaint. *See United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *5 (D.D.C. Feb. 26, 2021) ("At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer." (citing *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam)).

United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

## II.     The Attack of Officer M.F. and Others

After the Capitol was breached on January 6, 2021, the USCP requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol, impede more people from entering the Capitol, and expel the crowd that was already inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist, including MPD Officer M.F.

Shortly before 3:00 p.m., protesters had engulfed the west side of the Capitol and were climbing on the scaffolding in front of buildings as well as various features of the building. Although the Capitol had already been breached and rioters had flooded in through several entrances, a group of MPD officers and members of the USCP and other agencies called to assist were able to hold their position and deny entry through the prominent entrance of the lower west terrace—the doorway through which the President typically arrives during the inauguration. To enter the Capitol through the lower west terrace, one must walk through an arch and a short tunnel with a two sets of glass doorways, as pictured below in a photo from the evening of January 6, 2021 and a subsequent photo taken on January 13, 2021.





4

The violence the mob inflicted on officers defending the lower west terrace was particularly heinous. MPD Officer M.F. was one such officer. That afternoon, Officer M.F., wearing full MPD uniform and equipped with a body-worn camera, responded to a radio call for assistance at the Capitol, where he became involved in the effort to push back rioters from the doorway pictured above. While Officer M.F. was defending the doorway, a rioter pulled Officer M.F. into the crowd, where members of the crowd beat, tased, and robbed Officer M.F. of his MPD badge (#3603), police radio, and MPD-issued 17-round magazine. A member of the crowd also tried to forcibly remove Officer M.F.'s service weapon from its fixed holster while yelling words to the effect that he was going to take Officer M.F.'s gun and kill him. Following the assault, Officer M.F. lost consciousness and was hospitalized for his injuries, including a likely concussion and injuries from the taser, and for monitoring of his cardiac activity. The defendant, Thomas F. Sibick, is one of the individuals who attacked Officer M.F.

### III.    Thomas Sibick's Criminal Conduct

Mr. Sibick enthusiastically participated in the violent effort to breach the Capitol while Congress was certifying the results of the 2020 Presidential Election. He displayed his participation on social media by posting a "selfie" video on Instagram depicting himself in the mob near the inauguration ceremony stage of the lower west terrace. The video pans the crowd with the caption "Wildest experience of my life!!"

5



Mr. Sibick then filmed himself screaming, "Just got tear-gassed, but we're going, baby, we're going! We're pushing forward now!"



6

Mr. Sibick also posted a photo to Facebook of himself holding a police riot shield.



Surveillance video from January 6, 2021 showed that Mr. Sibick joined the effort to gain entry into the Capitol by advancing into the tunnel on the lower west terrace toward the glass doorway that leads inside. At that time, a group of USCP and MPD officers had formed a police line at that doorway to prevent the mob from entering the building through that entrance. Surveillance video shows Mr. Sibick entering the tunnel around 3:08 p.m., moving toward the police line, which was not visible on camera at that time, until he disappeared from view, and then turning around and moving outside the tunnel around 3:11 p.m., as shown in the below screenshots.







An open-source video posted on YouTube shows Mr. Sibick exiting the tunnel, as shown in the screenshot below.[2] In the video, an individual thanked Mr. Sibick for "his service" as he left the tunnel, and Mr. Sibick stated "Let's go. Let me just get refreshed."



_____

[2] The video can be found at *https://www.youtube.com/watch?v=0zyjCvDN4Ig&feature=youtu.be*. Mr. Sibick is visible coming out of the tunnel from minute marker 1:14:32 to 1:14:42.

Approximately eight minutes later, at 3:19 p.m., Mr. Sibick joined the violent attack on Officer M.F. by robbing the officer of his MPD-issued radio and badge. Officer M.F.'s body-worn camera depicts the incident, as shown in screenshots below.









Before Mr. Sibick forcibly ripped off Officer M.F.'s badge and radio, both of the items were securely affixed to the officer's tactical vest. As depicted in the photos below, Officer M.F.'s tactical vest contained a hole where Mr. Sibick forcibly ripped it off.





The below photo shows the back of a new badge that was issued to Officer M.F. after his badge was stolen. The vertical pin used to attach the badge, which was designed the same way in Officer M.F.'s stolen badge, matches the tear in the officer's tactical vest.



The photo below shows the compartment where Officer M.F.'s police radio was securely attached to his vest before Mr. Sibick ripped it off.



After tipsters who are familiar with Mr. Sibick sent the FBI the Instagram video of Mr. Sibick at the Capitol as well the photo of Mr. Sibick posing with a riot shield, agents conducted an initial interview with Mr. Sibick on January 27, 2021. At that time, the agents were not aware that Mr. Sibick had participated in the attack of Officer M.F. During the interview, Mr. Sibick acknowledged being in Washington, D.C. at the Capitol on January 6, 2021. Mr. Sibick described witnessing an officer being pulled down the steps, hit with a flagpole, and beaten in an attempt to get the officer's gun. Mr. Sibick described how the individuals were unable to get the gun because of the "plastic piece on top of the holster," and that he heard the attackers saying to "get his gun and kill him." Mr. Sibick claimed that he attempted to reach the officer and pull him away but was unable to do so and feared for his own life and that of the officer. Mr. Sibick stated that he decided to leave at the point because of the violence he witnessed. When shown the picture himself holding the riot shield, Mr. Sibick said that the shield had been passed through the crowd and Mr. Sibick asked someone to take a picture of him with it before giving the shield to another member of the crowd.

Mr. Sibick called one of the agents on February 2, 2021, to tell him that he planned to email the agent more information about the assault he witnessed. When asked, Mr. Sibick said that he did not have anything different to add to his prior interview, what he had previously described was accurate, and that he had not participated in the assault on the officer in any way.

FBI agents reinterviewed Mr. Sibick on February 23, 2021, after watching Officer M.F.'s body-worn camera and observing Mr. Sibick in close proximity to Officer M.F. After the agents showed Mr. Sibick still shots from the body-worn camera, Mr. Sibick admitted to grabbing the officer's badge and radio, but claimed that he had reached in to try to help the officer, and that he

remembered the badge coming off as he reached for him. Mr. Sibick claimed he pressed the "emergency orange button" once he had possession of the radio to get help for the officer. Mr. Sibick then changed his story three times in the course of the interview when asked what happened to the badge and radio after he had possession of it:

1. Mr. Sibick stated that he dropped the badge and radio right away and left.

2. When asked if he saw anyone pick up the radio and badge, Mr. Sibick then said that he carried the radio and badge with him when he left and dropped them in a trash can on Constitution Avenue. Mr. Sibick stated that he thought about giving the items to an officer but was afraid of being arrested.

3. Later in the interview, Mr. Sibick stated that he needed to "recant" his statement about what happened to the radio and badge. He stated that he brought the items to his hotel room and then back to his home in Buffalo, NY. Mr. Sibick stated that the day after he returned to Buffalo, he was on his way to take the items to the FBI, but he was afraid of being arrested and instead threw them in a dumpster on North Street in Buffalo, NY. On February 24, 2021, Mr. Sibick clarified to agents that he disposed of the radio and badge in a dumpster located on the back alleyway of the Lenox Hotel at 140 North Street, Buffalo, NY.

Mr. Sibick then changed his story a fourth time after an agent sent Mr. Sibick a ruse email on February 25, 20201 stating that the security cameras at the Lenox Hotel were going to be checked to confirm Mr. Sibick's statement that he disposed of the badge and radio in the dumpster. On February 26, 2021, Mr. Sibick called the agent stating that he was distraught and "wanted to do the right thing." Mr. Sibick stated that he did not dispose of the badge in the dumpster behind

the Lenox Hotel. Rather, he had buried the badge in his backyard. Mr. Sibick stated that he purchased and used a metal detector to find the badge, which he then dug up, and wanted to return. He stated that he had actually thrown away the radio, however.[3] Later that night, Mr. Sibick met the agent and gave him a bag containing mud and Officer M.F.'s badge (#3603). A photo of the recovered badge is depicted below.



Agents attempted to check records to verify whether the emergency button on Officer M.F.'s radio had been activated around the time of the robbery. MPD initially believed that the data had been erased but was later able to recover some data from Officer M.F.'s radio activity on January 6, 2021. The data showed that the emergency button was pressed at 2:37 p.m. and 3:37 p.m. Officer M.F.'s body-worn camera shows Mr. Sibick taking the radio at 3:19 p.m. (*see* screenshots from the body-worn camera *supra* on p. 10-11 of this memorandum). Officer M.F.'s body-worn camera also showed that at 3:20 p.m., a group of unidentified individuals in the crowd

---

[3] Agents were unable to find any security cameras to confirm or refute this claim.

surrounded the officer in order to protect him from his attackers. The below screenshot shows the time stamp in the upper right corner.



As shown on body-worn camera in the screenshots below, by 3:21 p.m., Officer M.F. had been escorted back to the police line where other officers pulled him to safety, and Officer M.F. then collapsed, seemingly unconscious.





According to this timeline, Mr. Sibick pressed the emergency call button on the radio approximately 16 minutes after Officer M.F. was pulled to safety by other officers.

## PROCEDURAL HISTORY

On March 10, 2021, Mr. Sibick was charged by criminal complaint for his involvement in the assault on Officer M.F. with Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Assaulting, Resisting, or Impeding Certain Officers or Employees, in violation of 18 U.S.C. § 111(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1), Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2), and Taking from a Person Anything of Value by Force and Violence or by Intimidation Within Special Maritime and Territorial Jurisdiction, in violation of 18 U.S.C. § 2111.

Mr. Sibick was arrested on the warrant in New York on March 12, 2021. At his detention hearing in the Western District of New York on March 12, 2021, the government made an oral motion to detain Mr. Sibick without bond pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) as he is charged with one count of 18 U.S.C. § 2111, which constitutes a crime of violence. At the conclusion of the hearing, Magistrate Judge H. Kenneth Schroeder, Jr. denied the government's detention motion and ordered that Mr. Sibick be released immediately. The government orally sought a stay of the Order pending its Motion for Emergency Appeal. The magistrate judge denied that request, and despite the government's best efforts, Mr. Sibick was released prior to the government filing its Motion for Emergency Appeal of Release Order (ECF No. 7).

In a Minute Order issued by Chief Judge Beryl A. Howell, the Court granted the government's Motion for Emergency Appeal of Release Order and directed the parties to appear

19

by video conference for a hearing on March 16, 2021 and further directed the parties to submit any documents related to the hearing by 12:00 p.m. on Monday, March 15, 2021. The government now submits this Memorandum in support of its request for detention. *See* 18 U.S.C. § 3145 (vesting the authority to review a magistrate's detention order in a judge of a court having original jurisdiction over the offense); *see also United States v. William Chrestman*, 21-mj-218-ZMF (BAH), at *12 (D.D.C. February 26, 2021).

## ARGUMENT

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. at 36.

There are four factors under Section 3142(g) that the Court should analyze in determining whether to detain Mr. Sibick pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against Mr. Sibick; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). A review and understanding of the facts and circumstances in

this case merit the conclusion that there is no condition or combination of conditions that would assure the safety of the community. *See* 18 U.S.C. § 3142(e)(1).

## I.       Nature and Circumstances of the Offense

During the course of the siege of the Capitol on January 6, 2021, over 100 law enforcement officers reported being assaulted or injured by the violent mob while attempting to protect the Capitol and the individuals inside the building. These assaults occurred both inside the Capitol, as well as on the grounds of the Capitol, where the enormous mob included numerous individuals with weapons, bulletproof vests, and pepper spray, targeted the officers protecting the Capitol. Additionally, members of the violent crowd encouraged each other to work together to overwhelm law enforcement and gain unlawful entry into the Capitol.

Mr. Sibick enthusiastically participated in the violent effort to enter the Capitol unlawfully and then bragged about it on social media—posting a picture of himself holding a riot shield like a trophy and a video of himself screaming into his camera, "Just got tear-gassed, but we're going, baby, we're going! We're pushing forward now!" He made good on his word by pushing into a tunnel on the lower west terrace of the Capitol and making his way toward a line of beleaguered and outnumbered police officers holding back the constant crush of the mob. Apparently overwhelmed by the effort, Mr. Sibick left the tunnel but promised a bystander who thanked him for his "service" that he would "go" after he got "refreshed." Mere minutes later, he again made good on his word by participating in one of the most horrific attacks on an officer that day. While Officer M.F. was violently attacked in the midst of a crush of rioters, beaten, tased, and threatened with his life, Mr. Sibick further violated him by robbing him of his police radio—which was his lifeline to call for help—and his badge—the symbol of his authority to do his job to protect the

Capitol that day. Fearful of being caught and held accountable for what he did, Mr. Sibick disposed of the radio and buried the badge in his backyard, unearthing it only when presented with the possibility that his lies about what happened to the badge could be disputed by surveillance video.

As this very Court previously noted, not all of the rioters charged with offenses stemming from the January 6 attack will be held pending trial. *Chrestman*, at *13. Rather, the Court previously evaluated several factors, to include: whether a defendant has been charged with felonies or misdemeanors*, id.* at *14; the extent to which a defendant engaged in prior planning, *id.* at *15; the defendant's use of a weapon, *id.*; evidence of coordination, *id.*; the defendant's role in the assault, *id.*; and a defendant's words and movements during the riot, *id.* at *16.

Here, the defendant's behavior is unquestionably disturbing: grabbing at law enforcement in the midst of the officer's struggle to survive and removing his badge and radio. While the evidence does not suggest pre-planning, the defendant's felonious conduct during and after the riot underscores his dangerousness. The fact that the defendant was willing to lie, on multiple occasions, to federal agents in the midst of one of the largest investigations in our nation's history sheds light on whether the Court can trust the defendant to comply with Court orders and any conditions of release. Moreover, we should not forget that the defendant's participation in a mob assault on Officer M.F. caused meaningful pain and suffering. As noted by this Court, "[g]rave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement . . . These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law." *Chrestman*, at *16.

To boot, one of the crimes the defendant is charged with—18 U.S.C. § 2111—is a crime of violence. *See United States v. Fultz*, 923 F.3d 1192 (9th Cir. 2019) (holding that 2111 was

categorically a crime of violence under elements clause of 18 U.S.C. § 924(c)). Congress thus determined that such crimes inherently carry a risk of danger to the community. Overall, the nature and circumstances of these offenses overwhelmingly weigh in favor of detention.

## II.     Weight of the Evidence

The second factor to be considered, the weight of the evidence, also weighs in favor of detention. The evidence against Mr. Sibick is strong and compelling. Multiple videos track Mr. Sibick's actions that day, including a body-worn camera video of Mr. Sibick robbing Officer M.F. of his badge and radio. Mr. Sibick's claims that he was trying to help Officer M.F. are unsubstantiated by the evidence. Rather, the evidence shows that Mr. Sibick proudly and eagerly participated in a violent riot and then forcibly robbed an officer who was in the midst of carrying out his duty to protect the Capitol.

## III.     History and Characteristics

The third factor, the history and characteristics of the person, similarly weighs in favor of detention. Mr. Sibick's criminal history contains six prior arrests, at least five of which resulted in a conviction and one of which has an unknown disposition according to the Pretrial Services Report prepared on March 11, 2021. Most troublingly, Mr. Sibick has a prior arrest for second degree aggravated harassment in New York in 2010 and a conviction for failure to stop or respond for a police command in Utah in 2015, the latter of which also included a dismissed charge for carrying a concealed loaded firearm.

Although Mr. Sibick voluntarily met with the FBI on multiple occasions, there is a difference between meeting with the FBI and being truthful with the FBI. Mr. Sibick repeatedly lied to law enforcement about what happened to the badge and radio he stole, and only told the

truth about what happened to the badge when threatened with the possibility that his lie would be discovered, suggesting a belief that he can talk his way out of trouble. His post-assault behavior thus lacked meaningful remorse, and in fact, showcased his intent to continue to obstruct and conceal evidence. While the government recognizes that Mr. Sibick voluntarily surrendered himself upon learning that there was a warrant for his arrest, the fact that the defendant "did not flee or evade arrest does little to mitigate the heavy weight of the other factors favoring detention." *Chrestman*, at *29.

## IV. Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the defendant's detention. Mr. Sibick is charged with violent and assaultive conduct. He eagerly and tenaciously participated in a violent mob bent on obstructing Congress from certifying the election results. His attempts to minimize, explain, and initially hide his conduct rather than taking full responsibility for what he did only exacerbates that danger.

In releasing Mr. Sibick, Magistrate Judge Schroeder cited the defense's argument that the Government had not arrested Mr. Sibick immediately after the interview on February 23, 2021, when Mr. Sibick admitted he was the individual in Officer M.F.'s body-worn camera who took the badge and radio. This delay, Judge Schroeder reasoned, shows that the government does not actually believe Mr. Sibick is a danger to the community. However, the Court should not "draw any conclusions from the delay in . . . arresting Mr. [Sibick]. The Government is permitted to make its own determinations on when to indict [or arrest] a defendant and without evidence of abuse or some facts to support that the delay was due to a lack of danger, the delay

does not affect the detention analysis." *United States v. Little*, 235 F. Supp. 3d 272, 279 (D.D.C. 2017); *see also United States v. Brown*, 2017 WL 4883375, *3 (W.D. Pa. Oct. 30, 2017) (rejecting the defendant's argument that "the Government's delay in arresting Defendant from February 2017 until after the Indictment in this case shows that the Government did not believe he was a serious danger to the community" and therefore his release would pose no danger to the community); *United States v. David Burgin*, 20-mr-78-RJA (RJA), at *12-14 (W.D.N.Y. May 4, 2020) (rejecting Magistrate Judge Schroeder's analysis that a delay in arrest demonstrates that the defendant is not a danger to the community). Indeed, the government is under no obligation to charge an individual as soon as it has evidence justifying arrest. Rather, the government is entitled to continue investigating other crimes before deciding to file charges. Here, Mr. Sibick changed his story multiple times from his initial interview to the time he turned over evidence of his crimes on February 26, 2021, and the government was entitled to continue investigating until it felt prepared to effectuate an arrest. Furthermore, Mr. Sibick has presented no evidence that the delay to arrest was due to a belief that Mr. Sibick was not dangerous.

The weight of the factors all individually favor detention. Given the above assessment of all four relevant factors, there are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community. This is especially so when the defendant's continued obstruction occurred not just at the Capitol but in the confines of his home and back yard where he buried Officer M.F.'s badge.

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court grant the government's motion to detain the defendant pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

*/s/ Cara Gardner*

Cara Gardner
Assistant United States Attorney
D.C. Bar 1003793
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
202-252-7009
Cara.Gardner@usdoj.gov

*/s/Tara Ravindra*

Tara Ravindra
Assistant United States Attorney
D.C. Bar No. 1030622
555 4th Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7672
Tara.Ravindra@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 15, 2021, I served a copy of this pleading on defendant's counsel through the Court's electronic filing system.

*/s/ Cara Gardner*
Cara Gardner
Assistant United States Attorney

26